[644 NYS2d 252]

WILLIAMSBURG AROUND THE BRIDGE BLOCK ASSOCIATION et al., Respondents-Appellants, v RUDOLPH GIULIANI, as Mayor of the City of New York, et al., Appellants-Respondents.

First Department, June 20, 1996

## APPEARANCES OF COUNSEL

*Matthew J. Chachère* of counsel *(Lucy Billings, Martin S. Needelman* and *Foster Maer* on the brief, attorneys), for respondents-appellants.

*Jane S. Earle* of counsel *(Pamela Seider Dolgow* and *Renee Hill* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellants-respondents.

*Frederick J. Jacobs* for New York State Assembly member Sheldon Silver and another, *amici curiae.*

## OPINION OF THE COURT

Tom, J.

The issue raised in this appeal concerns whether the promulgation of a "Protocol" by respondent the City of New York (the City), regulating the removal of lead paint from City-owned bridges, is subject to the procedural requirements of the New York State Environmental Quality Review Act (SEQRA; ECL 8-0101 *et seq.)*, the New York City Environmental Quality Review procedures (CEQR; 43 RCNY 6-01 *et seq.)*, and the New York City Administrative Procedure Act (CAPA; NY City Charter §§ 1041-1047).

In June 1992, the New York City Department of Transportation (the DOT) began a $1.6 million rehabilitation project on the Williamsburg Bridge (the Bridge), which is owned by the City. The vast majority of bridges in the United States, including the subject Bridge, have been coated with lead paint, which contains an extremely high concentration of lead in order to retard corrosion. According to statistics provided by the City, there are 2,062 bridges located within the City's five boroughs, of which the City owns or co-owns 838 (excluding culverts), or

approximately 41% .[1] During the renovation and repair of these bridges, the old paint is removed and is, eventually, replaced by lead-free paints.

One method of removing paint from the steel structures is abrasive blasting (commonly referred to as "sandblasting"), which involves directing abrasive particles, propelled by compressed air, against exposed surfaces of the bridge. This method, which is the most efficient, is necessary to reach hard-to-access areas and is also effective in removing "bonded rust", which has become incorporated into the surface of the steel. An inherent problem with sandblasting, however, is that it creates a fine airborne lead dust which can be inhaled and other particles, too large to be inhaled, but which nevertheless can be swallowed and absorbed into the body through the gastrointestinal tract.

It is well documented and beyond dispute that lead is a highly toxic metal which, when introduced into the human body, produces a wide range of adverse health effects, especially with regard to children and developing fetuses. Petitioners' experts and submissions, unrebutted by respondents, indicate that these consequences include: nervous and reproductive system disorders; delays in neurological and physical development; cognitive and behavioral changes; and hypertension. Most of these physical maladies are irreversible.

Further, it appears that young children are more sensitive to lead exposure than adults, particularly their brain and nervous systems, which are especially vulnerable in their developmental stages. Lead exposure as low as two micrograms per deciliter in children under seven years old lowers IQ, stunts growth and causes behavioral disorders (see, Dietrich, Berger & Succop, *Lead Exposure and Motor Development Status of Urban Six-Year Old Children in the Cincinnati Prospective Study*, 91 Pediatrics 301-307 [1993]; Bellinger, Stiles & Needleman, *Low-Level Lead Exposure, Intelligence and Academic Achievement; A Long-term Follow-Up Study*, 90 Pediatrics 855-861 [1992]).

The Bridge, on both sides of the East River, spans densely populated neighborhoods. The project, which began on the Brooklyn side of the Bridge, and which utilized an independent contractor hired by the City, involved sandblasting the existing paint on the Bridge in order to remove it. As noted by the IAS

---

1. The remaining bridges are owned by the State, various quasi-governmental and privately owned railroads, the Port Authority, the New York State Thruway and Bridge Authority, or are privately owned.

Court, "[b]y all accounts, the project was a public relations and public health fiasco." (167 Misc 2d 980, 984.) Videotape evidence submitted by petitioners shows a dust cloud emanating from the work area of the Bridge, as well as deposits of debris in a private home and throughout the neighborhood.

In July 1992, apparently as the result of neighborhood residents' complaints regarding lead dust contamination, the DOT suspended work on the Brooklyn side of the Bridge, only to begin work in the same manner on the Manhattan side. After similar complaints were received from the Lower East Side residents, the New York State Department of Environmental Conservation (the DEC) issued a notice of violation to the contractor for fugitive dust emissions greater than 20% and work was stopped completely on the Bridge.

Between June and August 1992, the New York City Department of Health conducted tests of sidewalks and streets, as well as people, within a five-block radius of the Bridge. The tests indicated, *inter alia*, that children on both sides of the Bridge displayed elevated levels of lead in their blood, although it could not conclusively be determined that these findings were the result of the work being performed on the Bridge.

On September 2, 1992, former Mayor David Dinkins announced the formation of the Williamsburg Bridge Abrasive Blasting Task Force (the Task Force) to develop a protocol consisting of appropriate remedial recommendations regarding construction standards and monitoring methods which needed to be implemented to contain fugitive lead emissions during the ongoing bridge project.

On December 20, 1993, the Task Force through the DOT's Bureau of Bridges issued a "Protocol" (the Protocol), which consisted of an "outline of the procedures and methodologies the [DOT] * * * will utilize during all lead paint removal activity on the City's bridge structures." The Protocol includes, *inter alia*: a General Policy Statement for Lead Paint Removal; Compliance and Containment Procedures; Air/Surface Soil Monitoring Procedures; and Clean-Up Procedures.

The petitioners maintain that the Protocol's policies and procedures will not adequately protect the public health and, in support of their contentions, submit the affidavits of five experts in related fields. Overall, the experts concluded that the Protocol's containment, compliance, air and soil monitoring, clean-up and community notification procedures are inadequate to protect the residents of communities near the

sandblasting, as well as the workers engaged in the project, from the harmful effects of lead dust and debris. Petitioners demanded that the City comply with the mandatory public review processes set forth in SEQRA, CEQR and CAPA, including the preparation of an Environment Impact Statement (EIS).

Petitioners, including various neighborhood civic organizations, City and State elected officials and a Community Board, commenced the within CPLR article 78 proceeding on or about February 23, 1994 and by cross motion dated May 2, 1994, respondents moved to dismiss the petition. By decision and judgment dated October 6, 1995 (167 Misc 2d 980, *supra*), Justice Schoenfeld, in a well-reasoned decision, granted the petition to the extent of declaring that the Protocol is subject to the procedural requirements of SEQRA and CEQR, but is not subject to CAPA. The IAS Court also enjoined the respondents from implementing the Protocol and from conducting any lead paint removal from City-owned bridges without complying with the applicable requirements of SEQRA and CEQR. Respondents appeal and petitioners cross-appeal (to the extent that the IAS Court found that the Protocol was not subject to CAPA), and we now affirm.

If this Court were to review the Protocol pursuant to the arbitrary and capricious standard as urged by petitioners before the motion court, we would be required to give deference to an agency's determination that concerns an area involving its authority, expertise and experience (*Matter of Consolation Nursing Home v Commissioner of N. Y. State Dept. of Health*, 85 NY2d 326, 331-332; *Matter of Memorial Hosp. v Axelrod*, 68 NY2d 958, 960). The petitioner seeking to nullify the regulation must shoulder a heavy burden in demonstrating that the regulation is unreasonable and unsupported by any evidence (*Matter of Consolation Nursing Home v Commissioner of N. Y. State Dept. of Health*, *supra*, at 332; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340, 349-350). In the instant matter, petitioners have failed to meet this burden as the City's submissions evinced a determined, good-faith effort to establish safety guidelines to protect the inhabitants of neighborhoods abutting the City's bridges.

The question herein, however, is not substantive but procedural, specifically, whether the City, in adopting the Protocol, was required to comply with the public hearing/comment and technical procedural requirements of SEQRA and CEQR.

SEQRA was enacted in 1975 and became effective on September 1, 1976 (L 1975, ch 612, § 2, as amended by L 1976, ch 228, § 4). Its stated purpose is "to declare a state policy which will encourage productive and enjoyable harmony between [humanity] and [the] environment; to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state." (ECL 8-0101.)[2]

The Legislature has further declared that "to the fullest extent possible", environmental factors should be considered in reaching decisions on proposed projects (ECL 8-0103 [6], [7]; *Matter of Tri-County Taxpayers Assn. v Town Bd.*, 55 NY2d 41, 46). Then Governor Hugh Carey noted in his memorandum in support of SEQRA that the information contained in the impact statement would allow State and local officials to better assess environmental factors in conjunction with social, economic and other relevant considerations, to be in a better position to make decisions which are in the best over-all interest of the people of the State (1975 NY Legis Ann, at 438-439).

In *Matter of Jackson v New York State Urban Dev. Corp.* (67 NY2d 400, 414-415), the Court of Appeals gave the following overview of SEQRA: "SEQRA makes environmental protection a concern of every agency * * *. In proposing action, an agency must give consideration not only to social and economic factors, but also to protection and enhancement of the environment * * *. SEQRA ensures that agency decision-makers— enlightened by public comment where appropriate—will identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices."

The "heart" of SEQRA is the Environmental Impact Statement (*Matter of Jackson v New York State Urban Dev. Corp.*, supra, at 415; *Matter of Town of Henrietta v Department of Envtl. Conservation*, 76 AD2d 215, 220), and pursuant to SEQRA's terms, an EIS must be prepared whenever any action by any agency "may have a significant effect on the environment"

---

**2.** The declaration of policy, as well as the remaining substantive sections of SEQRA, are modeled on the National Environmental Policy Act (NEPA; 42 USC § 4321 *et seq.*). For a detailed discussion, *see,* Orloff, *SEQRA: New York's Reformation of NEPA*, 46 Alb L Rev 1128 (1982).

(ECL 8-0109 [2]).[3] SEQRA "mandates a rather finely tuned and systematic balancing analysis in every instance" (*Matter of Town of Henrietta v Department of Envtl. Conservation, supra*, at 223).

The DEC has adopted regulations (6 NYCRR 617.1 *et seq.)* governing the process, both procedural and substantive, for outlining an EIS. 6 NYCRR 617.11 sets forth the criteria for determining whether an action will have a "significant effect on the environment", including: a substantial change in existing air quality (6 NYCRR 617.11 [a] [1]) and the creation of a hazard to human health (6 NYCRR 617.11 [a] [7]). The foregoing list, however, by its own terms, is illustrative and not exhaustive.

An EIS must identify the relevant areas of environmental concern, take a " 'hard look' " at them, and present a " 'reasoned elaboration' " of the basis for its determination (*Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 417, *supra; Chinese Staff & Workers Assn. v City of New York*, 68 NY2d 359, 363-364). An EIS must include, *inter alia*, pertinent information regarding a project's long-term, short-term and cumulative environmental impacts (ECL 8-0109 [2] [a], [b]; 6 NYCRR 617.14 [f] [3]; 43 RCNY 6-09 [d] [2]); alternatives to the proposed action (ECL 8-0109 [2] [d]; 6 NYCRR 617.14 [f] [5]; 43 RCNY 6-09 [d] [5]); and mitigation measures proposed to minimize the project's environmental impact (ECL 8-0109 [2] [f]; 6 NYCRR 617.14 [f] [7]; 43 RCNY 6-09 [d] [7]).

SEQRA defines "environment" broadly as: "[T]he physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character." (ECL 8-0105 [6].)

---

3. Most of the substantive provisions of SEQRA are contained in ECL 8-0109, which provides, in pertinent part:

"1. Agencies shall use all practicable means to realize the policies and goals set forth in this article, and shall act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects, including effects revealed in the environmental impact statement process.

"2. All agencies * * * *shall* prepare, or cause to be prepared by contract or otherwise *an environmental impact statement on any action they propose or approve which may have a significant effect on the environment.*" (Emphasis added.)

CEQR's[4] requirements concerning the definition of environment and when an EIS is appropriate are virtually identical. 43 RCNY 6-12 provides: "(a) No final decision to carry out or approve an action which may have a significant effect on the environment shall be made until after the filing and consideration of a final EIS."

CEQR defines "significant effect" as, *inter alia*:

"(a) An action may have a significant effect on the environment if it can reasonably be expected to lead to one of the following consequences:

"(1) *a substantial adverse change to ambient air or water quality* * * * or in solid waste production * * *

"(7) *the creation of a hazard to human health or safety.*" (43 RCNY 6-06; emphasis added.)

"The threshold at which the requirement that an EIS be prepared is triggered is relatively low: it need only be demonstrated that the action may have a significant effect on the environment." (*Chinese Staff & Workers Assn. v City of New York, supra,* at 364-365; *Matter of Chemical Specialties Mfrs. Assn. v Jorling,* 85 NY2d 382, 397; *Matter of Teich v Buchheit,* 221 AD2d 452; *Matter of Miller v City of Lockport,* 210 AD2d 955, 957, *lv denied* 85 NY2d 807; *H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 232.)[5] The purpose of an EIS is to act as an "environmental 'alarm bell' ", the purpose of which is to alert public officials to environmental shifts before those changes reach "ecological points of no return" (*Matter of Town of Henrietta v Department of Envtl. Conservation, supra,* at 220; *see also, Matter of Badura v Guelli,* 94 AD2d 972, 973).

In the matter at bar, there can be no dispute that the work performed by the City on the Williamsburg Bridge, which resulted in the emission of a cloud of fine hazardous lead dust over densely populated areas composed of schools, open-air markets, homes, parks and playgrounds, and which led to the filing of two Federal actions by the EPA concerning the release

---

4. SEQRA requires agencies which are subject to its provisions to implement the statute's requirements, although procedures more protective of the environment can be adopted (ECL 8-0113 [3] [a]). Thus, the propriety of respondents' issuance of the Protocol must be judged not only according to the requirements of SEQRA, but also according to the regulations promulgated by the City in CEQR where the latter regulations are more protective of the environment.

5. In *H.O.M.E.S. (supra,* at 232), the Court noted that SEQRA, despite being modeled after NEPA, is more demanding than its Federal counterpart, which only requires an EIS for "major Federal actions significantly affecting the quality of the human environment" (42 USC § 4332 [2] [C]).

of hazardous materials in violation of numerous State and Federal statutes, falls within the ambit of a "significant effect on the environment" so as to trigger the provisions of SEQRA and CEQR.

Further, the Protocol itself, which the IAS Court rightly characterized as "something of an ersatz EIS" (167 Misc 2d, *supra,* at 989), also implicates the requirements of SEQRA and CEQR. A review of the Protocol makes it plain that it is an adoption of agency rules and procedures, constitutes agency planning and policy-making that may affect the environment, and commits the DOT to a definite course of decision-making in the future (6 NYCRR 617.2; ECL 8-0105 [4] [ii]; 43 RCNY 6-02 [Action] [4]). The Protocol explicitly states that "[t]he policies and procedures outlined below will be applied to all of the lead paint removal activities * * * conducted by the Bureau of Bridges * * *. These guidelines will be modified and updated as additional data and information is gathered * * * unless otherwise indicated, these protocols shall be applied to *all* types of bridges/structures." By adopting the foregoing, the DOT has set forth a City-wide policy under which it will conduct all future lead paint removal operations on City bridges. Given the effects of the respondents' expansive plan, we conclude that this is precisely the environmental policy-making which, pursuant to SEQRA and CEQR, requires a full environmental study and an opportunity for public feedback.

The respondents argue that the Protocol is not an action subject to SEQRA and CEQR but, rather, consists of "maintenance or repair involving no substantial changes in an existing structure" (6 NYCRR 617.2 [q] [3]; 43 RCNY 6-04 [f]). We disagree.

In the first instance, the Protocol is itself not routine maintenance and repair, but a policy decision setting forth agency guidelines as well as a format governing procedures not only for maintenance and repair projects, but also for major rehabilitation projects, including the remediation of hazardous waste spillages. As such, it constitutes an action under SEQRA and CEQR.

In any event, the work commenced on the Williamsburg Bridge does not fall within the statutory definition of "maintenance or repair involving no substantial changes." We agree with the finding of the IAS Court that the aforestated exception must be read to be applied to routine and ordinary maintenance on existing structures (*see, Matter of Padavan [Cuomo],* NYLJ, June 27, 1984, at 14, col 1 [Sup Ct, Queens County]). We

find that the abrasive sandblasting of lead, a toxic substance long recognized as a hazardous waste, from elevated structures suspended over densely populated residential communities, supported by the use of containment structures, filtration, decontamination and monitoring units, environmental consultants, and an emergency response plan, could not, even under the most lax of standards, be classified as routine maintenance or repair.

Nor are we persuaded by respondents' assertion that the preparation of an EIS is not required because the work being performed on the Williamsburg Bridge is a "Type II" action. Type II actions are defined as "[a]ctions or classes of actions which have been determined not to have a significant effect on the environment" (6 NYCRR 617.13 [a]). It is safe to conclude, without proceeding further, that the project in question did have a significant effect on the environment, specifically, the release of a cloud of toxic material. Further, a review of the list of Type II actions (6 NYCRR 617.13 [d]), which include street openings for repair or maintenance of utility facilities (6 NYCRR 617.13 [d] [5]); maintenance of landscaping and natural growth (6 NYCRR 617.13 [d] [9]); maintenance and repair of farm buildings (6 NYCRR 617.13 [d] [3]); and the repairing of highways (6 NYCRR 617.13 [d] [4]), makes it clear that Type II actions are those which have either a minimal or nonexistent environmental impact. The cases cited by respondents support this conclusion (*see, e.g., Matter of New York Horse & Carriage Assn. v Council of City of N. Y.*, 169 AD2d 547, *lv denied* 78 NY2d 851 [which involved license restrictions on horse-drawn carriages in Central Park]; *Matter of Morningside Hgts. Hous. Corp. v New York City Tr. Auth.*, 174 AD2d 673 [where it was found that the Transit Authority's elimination of speed restrictions on a certain stretch of track did not require the preparation of an EIS]).

We also agree with the IAS Court that the Protocol is not the equivalent of an EIS and does not satisfy SEQRA and CEQR. We have previously held that "[a] key element in the environmental review process is the public review and comments on the [Draft Environmental Impact Statement]" (*Coalition for Responsible Planning v Koch*, 148 AD2d 230, 234, *lv denied* 75 NY2d 704) so as to draw "on the reservoir of public information and expertise which SEQRA intends to tap" (*Matter of Rye Town/King Civic Assn. v Town of Rye*, 82 AD2d 474, 482, *lv dismissed* 56 NY2d 985). Further, it has been held that literal compliance with SEQRA's procedural requirements is

mandated (*Horn v International Bus. Machs.*, 110 AD2d 87, 92, *lv denied* 67 NY2d 602; *Glen Head—Glenwood Landing Civic Council v Town of Oyster Bay*, 88 AD2d 484), as substantial compliance would not comply with SEQRA's underlying purposes, but would tempt State and local agencies to circumvent SEQRA's mandates (*Glen Head—Glenwood Landing Civic Council v Town of Oyster Bay, supra*, at 491; *see also, Matter of Schenectady Chems. v Flacke*, 83 AD2d 460; *Matter of Martin v Koppelman*, 124 AD2d 24).

The respondents herein have not, in our review, complied with the public comment mandates of SEQRA and CEQR and, in fact, only allowed limited public participation and scrutiny. Accordingly, respondents cannot be heard to argue that the Protocol is the procedural and substantive equivalent of an EIS.

Finally, the IAS Court correctly issued an injunction enjoining the implementation of the Protocol and the removal of lead paint from City-owned bridges. 6 NYCRR 617.3 (a) provides that: *"[n]o agency involved in an action shall carry out, fund or approve the action until it has complied with the provisions of SEQR[A]."* (Emphasis added.) Given the respondents' failure to comply with the provisions of SEQRA and CEQR, the Protocol is rendered null and void (*Chinese Staff & Workers Assn. v City of New York, supra*, at 369; *see also, Matter of Tri-County Taxpayers Assn. v Town Bd., supra*). Further, since the contemplated project is an "action" within the meaning provided by SEQRA and CEQR, work should not be restarted until SEQRA and CEQR are complied with and the City agencies responsible thereafter prepare an EIS.

Petitioners have also demonstrated that they would be irreparably harmed, further warranting the injunctive relief granted by the IAS Court (*see, Hennessy v Hannan*, 79 AD2d 1079; *Kane v Walsh*, 295 NY 198) as there can be no doubt in the face of overwhelming medical evidence that the ingestion of lead leads to irreversible and serious medical problems.

Were we to review the granting of the injunction under the criteria which must be demonstrated in order to obtain a preliminary injunction, as the respondents urge, the result would be the same. Petitioners have demonstrated that they would succeed on the merits and have also demonstrated that they would be irreparably harmed. The third and final element, a balancing of the equities, also strongly favors the petitioners, residents of the affected neighborhoods who have been subjected to a toxic cloud. It is in their interests that the City,

having failed initially, must now strictly adhere to the mandates of SEQRA and CEQR.

With regard to the applicability of CAPA, we decline to reach the issue at this time since the provisions of CAPA upon which petitioners focus, those concerning public notice and the opportunity for public comments, are redundant to the notice and comment provisions of SEQRA and CEQR.

Accordingly, the judgment of the Supreme Court, New York County (Martin Schoenfeld, J.), entered October 6, 1995, which, *inter alia*, declared the respondents' promulgation of a Protocol governing the methodology or removal of lead paint from City bridges to be subject to the provisions of SEQRA and CEQR, and enjoined the commencement of such work pending compliance with SEQRA and CEQR, is unanimously affirmed, without costs.

ROSENBERGER, J. P., NARDELLI, WILLIAMS and MAZZARELLI, JJ., concur.

Judgment, Supreme Court, New York County, entered October 6, 1995, affirmed, without costs. [As amended by unpublished order entered Oct. 1, 1996.]