OPINION OF THE COURT
William P. Polito, J.
Procedural History
This controversy involves property in the Town of Brighton *263 used as an abortion clinic or facility.
On June 6, 2000 the parties stipulated this matter before the court as a CPLR article 78 petition. The last submission was February 2001.
Relief Requested
Petitioner is a not-for-profit corporation, Brighton Residents Against Violence. The respondents are Town of Brighton authorities. The owner has elected not to participate in this application.
The petitioner seeks to annul the Town of Brighton’s administrative approval for the owner to construct a 175-foot to 250-foot earth covered bomb protective concrete barrier on the owner’s property. The barrier has been constructed.
The petitioner also seeks to prohibit the building’s use as an abortion facility unless it becomes properly sited for such use under the State Environmental Quality Review Act (SEQRA) and the Town of Brighton Zoning Code (TZC) by the Town’s Planning Board and other relevant boards and agencies.
The Factual Background
The owner demolished a ranch house on the subject property in order to construct a commercial building for medical offices.
Because he desired to change an existing use and erect new structures, the owner needed land use approval from the Town Planning Board.
Application was made for a permitted use. A permitted use in the BE-1 district is “an office building for medical use, such as * * * doctors, including all medical specialists.” The Planning Board approved the site plan for these structures as a “doctors’ office,” a permitted use.
The application did not reveal the intended use of the property as an abortion clinic or facility. Neighbors were totally unaware that the proposed medical building would contain an abortion clinic. They first learned of its use as an “abortion clinic” when pro-life pickets and protesters appeared at the site after it had been approved as a doctors’ office.
The neighbor and owner then approached the Town Planner (Planner) seeking to modify the approved site plan. They sought to add an inground 175-foot to 250-foot-long concrete barrier called a “berm” by the Planner as a bomb protective measure against potential violence due to the building’s use as an “abortion clinic.” There was no other purpose proposed or intended for the barrier, such as audio or visual screening, or *264 to keep out persons. The barrier is solely ancillary to the use of an abortion clinic.
The Planner approved the barrier and his decision has been ratified by the Zoning Board 4 to 1. The barrier has been built. The Court’s Decision
The respondent’s request for a declaratory judgment removing the Town as a party to the article 78 review is denied as the Town is also a signatory to the agreed review of this proceeding.
The court annuls the approval of the bomb protective barrier, and grants mandamus against the Town to order and secure its removal, and grants annulment and prohibition of the use of the building as an abortion facility and grants mandamus against the Town to enforce such restricted use.
This order is stayed as agreed between the parties.
The decision of the Planner was arbitrary and capricious. There was no basis for the Planner’s decision. The several standards applied by the Planner in determining that the change was minor were arbitrary and capricious.
Barrier as Not Effecting Other Structures
One standard used by the Planner and approved by the Zoning Board of Appeals was that since the wall did not change existing structures, landscape, sewers or paved areas, it therefore must be minor. However, there may still be functionally significant impacts resulting from an additional structure or use change even though it does not change existing structures, landscape, sewers or paved areas. Examples are the erection of a large underground shelter, a perimeter fence to restrict the inhabitants, or as here the construction of a large inground bomb proof barrier.
Inconsistently, here the Planner did find that the threat of bombing to an abortion facility was sufficiently significant to require its mitigation by erection of a large bomb protective barrier, but too “minor” for Planning Board reconsideration. Such major determinations are reserved to the Planning Board and it was error for the Planner to make them.
Accordingly, the court finds the determination that the change was minor based on that standard was arbitrary and *265 capricious as a matter of law. The record does not support the determination of the Planner and Zoning Board that the barrier modification was “minor.” Substantial, nonminor modifications needed to be submitted to the Planning Board. (Ferrari v Town of Penfield Planning Bd., 181 AD2d 149 [4th Dept 1992],)
Barrier as a Berm — The Planner characterized the barrier as a “berm” (letter of Ramsey Boehner, Dec. 15, 1998).
There is no definition of a berm in the Town Code. The American Collier Dictionary defines it as the “dirt shoulder alongside the road.” Further, the Town Code uses the description of berm functionally as an aesthetic tool to provide audio or visual screening or prevent access around a property perimeter. (TZC §§ 213-15, 207-19. [F], [G], [H]; appendix part 1.) There was no indication here that the barrier was intended to serve any of those functions. The Planner’s characterization of the barrier as a “berm,” and the failure to indicate in the record its true purpose and function, was misleading. Further, even a “berm” is explicitly required to be “sited” for approval by the Planning Board. (TZC § 217-12 [B] [4] [f]; [C] [5].) The Planning Board specifically approved this area to be open without a visual berm.
Most importantly, however, is that we are obviously dealing with more than a “berm.” The barrier is a structure whose size, specifications and the efficacy of its real intended purpose need to be evaluated. Those determinations required submission to the Planning Board.
Barrier as a Fence — The Planner is alleged to have advised the applicant that the bomb barrier was similar to a six-foot perimeter fence which did not require a permit or approval. In the recent New York Supreme Court case of LP Assoc. v Town of Brighton (Sup Ct, Monroe County, Polito, J., Index No. 11053/99), the Town of Brighton sought the removal of a perimeter fence because the owner failed to obtain prior Planning Board approval. The Town’s position was inconsistent with its position in this case.
Further, Brighton’s Code indicates similar dangerous situations require more than administrative approval. For example, barbed wire fences require not only a permit but Zoning Board of Appeals prior approval (TZC § 129-8 [e] [General Requirements]), as do matters necessitating the public’s protection from explosives. (TZC § 73-21 [A] [4].)
The purpose, function and effect of the bomb protective barrier in this case is significant and different from the usual *266 purposes of a fence, and required submission to the Planning Board. (See Matter of Padavan [Cuomo], NYLJ, June 27, 1984, at 14, col 1; 1 Gerrard, Ruzow, Weinberg, Environmental Impact Review in New York, § 2.01 [4] [c], at 2-28 [a seven-foot perimeter fence to protect neighboring properties was deemed not insignificant or minor and required SEQRA review].) Padavan was cited with approval in Williamsburg Around the Bridge Block Assn. v Giuliani (223 AD2d 64, 72-73 [1st Dept 1996]).
Here the purpose and function of the concrete protective barrier to protect from bomb debris for the security of the public and adjoining property is not insignificant or minor. The single neighbor, the Town Planner and the developer agreed privately among themselves that the wall and/or embankment was necessary for the protection of the occupants of the day care center. However, determination of whether the barrier was necessary and appropriate was one which could and should have been made by the Planning Board as lead agency.
The Planner’s Determination That the Barrier was Safe was Arbitrary and Capricious
It was undisputed the sole purpose of the barrier was to provide bomb protection to the children in a nearby building. However, there was no evaluation in the record or indication by the Planner or the town engineer of the sufficiency of the structure for that intended purpose. Nor was such intended sole purpose and function even disclosed to the Zoning Board in the Planner’s written submission to it for review. In acting alone, the Town Planner acted beyond the scope of authority given him by the Town Ordinance. The issue should have been referred to the Planning Board.
Introduction of an Abortion Clinic With a Protective Bomb Barrier to a Site Approved for a “Doctors’ Office” Called for Further Review by Town Officials
The Town of Brighton Zoning Code and SEQRA are applicable to any undisclosed intended uses, to a later change of use of the approved site plan, or to any later discovered facts which might have a significant impact and were not originally considered by the Planning Board. All three situations are applicable here and each require resubmission to the Planning Board.
The Use of the Property as an Abortion Clinic was a “New Use” Requiring Planning Board Approval
*267 A clinic engaging in and soliciting large numbers of abortions is a new and different use from that approved as a “doctors’ office.”
A new use can only be approved by the Planning Board. (TZC § 73-18C, 73-19B.) The Planner’s determination that the building’s use as an abortion clinic was not a new use is arbitrary and capricious.
In a recent Pennsylvania case the court determined that Planned Parenthood’s entry into surgical abortions under its nonconforming use for “medical and health services” was a new use as a matter of law, and required a new determination as to whether it was allowable under its zoning law. “The municipality may * * * refuse an application which, although claimed to be a natural expansion of a nonconforming use, is in fact and law a new different use.” (May v Lancaster United For Life, Common Pleas Ct, Lancaster County, Pa, Feb. 11, 2000, Allison, J., slip op at 25, 26, affd 741 A2d 256, lv denied 563 Pa 668, 759 A2d 389, 565 Pa 679, 775 A2d 811.)
This court holds that an abortion clinic with a bomb protection embankment appears on its face to be qualitatively dissimilar to a simple medical building or a doctor’s office.
The owner did not properly obtain the approvals required and is not operating the commercial structure legally.
Here, the Planner and Zoning Board assumed that the Planning Board approved the use of the building as an abortion clinic, facility or center. The Planning Board record does not disclose that this was the case. It was not disputed at the Zoning Board hearing that the undisclosed principal of the Planning Board process and the applicant always intended the medical building to be used in part as an abortion facility called “Center for Menstrual Disorders and Reproductive Choices.” There is no indication the applicant ever disclosed such intended use to the Planning Board. Moreover, there is nothing in the Planning Board record to indicate that the Planning Board made the required public findings, identification of environmental and/or land use concerns, and the necessary “hard look” site evaluations and considerations with public input for such specific intended use. The record before the Planning Board does not indicate that the Planning Board, the prior review committees, or the staff at its preliminary meetings with the applicant had knowledge of such intended use or sought such information.
Because the application was made by the developer rather than the medical provider, and the use of the proposed *268 structure was not fully disclosed, the applicant and the Board deprived interested parties and the public of their statutory right to be heard about their concerns. They were effectively prevented from expressing concerns about safety, economics and environment before the Planning Board.
Therefore the notice of the first meeting of the Planning Board was fatally defective. The misleading notice totally frustrated and undermined an opportunity for a full and appropriate hearing of the relevant issues including the question of whether an abortion clinic should be treated simply as another doctor’s office. The insufficiency of the notice frustrated both the public policy of the ordinance of the Town of Brighton for site plan approval and state law for environmental evaluation which mandates an opportunity for public input.
Whether an abortion clinic as conducted by the principal here is allowable as a permitted use as a “doctors’ office” or is, rather, a conditional use as a “health facility,” is a determination initially reserved to the Planning Board. A conditional use is discretionary and mandates consideration of a myriad of applicable siting standards impacting on the neighbors and area, including safety and effect on property values.
A health facility or doctors’ office which performs “in-patient” services or provides overnight accommodations may not be an allowed use in this area. (TZC § 201-5 [Definitions — Medical office].) Whether this facility will operate in such a manner is also a finding initially reserved to the Planning Board.
Such zoning restrictions have been found constitutionally permissible. The Federal and State Constitutions allow the preclusion of certain types of businesses which have secondary effects of reducing adjoining property values of residential prop - erty or businesses, or are inconsistent with the general zoning of the area, or otherwise adversely affect the neighborhood. They may require location of such businesses away from dwell - ings, churches, and schools. (City of Renton v Playtime Theatres, 475 US 41, 47 [1986].) They may even limit their location to certain manufacturing and high density commercial districts. (Stringfellow’s of N.Y. v City of New York, 91 NY2d 382 [1998]; see Brighton Town Zoning Law ch 202 [Adult Use and Enter - tainment Districts]; §§ 202-4, 202-5.)
In Brighton, there are special considerations as to safety required near residential neighborhoods (TZC § 217-51).
The Pennsylvania trial court in May (supra) determined that the siting of an abortion facility in a residential neighborhood *269 created significant safety considerations, and that such siting was “unsafe.”
The Pennsylvania court concluded as a matter of law that the abortion services to be rendered in the neighborhood were detrimental and a finding by the Board to the contrary in light of the proof submitted was an abuse of discretion:
“The finding by the Board that this use will not be a detriment to the community is an abuse of discretion and a disregard of the irrefuted testimony of the individuals who live in this community. In this residential community, Planned Parenthood is preparing for violence.” (May, supra, slip op at 25. )
“One cannot refute in good faith, that the introduction of * * * abortion services in a residential neighborhood will be a detriment to the health, safety and welfare of this community. The Board disregarded the record, abused its discretion and committed an error of law by finding otherwise.” (Id. at 27.)
Accordingly, the omission by the Planning Board of the findings required under its Town Code, and the determinations of the Planner and Zoning Board that the structure or use was “safe” and “minor” or insignificant and, thus, did not require prior Planning Board approval, were legally deficient, and this court reverses and annuls the same.
Use of an Abortion Clinic With a Concrete Reinforced Embankment on the Site Raised Significant Environmental Issues and Land Use Considerations Requiring Review by the Lead Agency
The Zoning Board here failed to recognize that the siting of an abortion clinic under these circumstances, whether as a doctors’ office or as a health facility, would have significant land use impacts and environmental consequences which required a prior submission to and evaluation by the Planning Board.
In the Pennsylvania case, Planned Parenthood, when asked why it needed bulletproof glass and other security devices in its proposed Pennsylvania abortion facility, emphasized “One would have to be living in a cave in the U.S. of America in this decade to not understand that there áre security risks [sic] for providing protective health care.” (May, supra, slip op at 25, 26. )
That Zoning Board, as here, sought to overlook the need for security measures as insignificant or irrelevant to the siting process in a particular neighborhood. The court admonished *270 that such attitude as a matter of law “completely disregards the significance of Zoning Laws in our commonwealth. The fact that a business within this community is compelled to fortify its structure and install bulletproof glass is certainly relevant to whether such use is appropriate for that zoning district.” (Id. at 25.)
Our community’s experience has been that abortion clinics attract attention and may create public safety problems that other doctors’ offices do not. The Planning Board needed to evaluate the consequences of the use proposed, after adequate public notice and input, and after giving consideration to SEQRA criteria.
In addition to the neighborhood safety considerations, there were other land use regulations which the record shows the Planning Board failed to consider.
Even with permitted uses like “doctors’ offices,” those criteria permit the Planning Board to direct details of construction and attach conditions relating to safety considerations, including the likely presence of traffic, peaceful and prayerful protestors, and police at the property.
SEQRA mandated Planning Board reevaluation of this project when the project began being used as an abortion clinic or facility.
The principle of SEQRA review is applied to improvements, as here, involving the security or safety of neighbors. (Williamsburg Around the Bridge Block Assn. v Giuliani, 223 AD2d 64 [1st Dept 1996].)
The statute is discussed extensively in Jackson v New York State Urban Dev. Corp. (67 NY2d 400, 414-417, 429, 430 [1986]) and emphasizes the mandatory nature of public disclosure of all adverse effects, the failure of which will render the determination void.
State law delegates the responsibility for environmental impact to the lead agency, which in this case is the Planning Board. (Jackson, supra at 429, 430.) The required totality of possible environmental impact was never resolved because it was never presented.
Even if the “doctors’ office” was approved generally or “genetically,” SEQRA requires the lead agency to apply the SEQRA process when later discovered information indicates the existence of a significant environmental impact which has not been reviewed for the protection of the public. (6 NYCRR 617.9 [a] [7] [i] [c].)
*271 Here, the Planner and the Zoning Board admittedly determined at least one significant adverse impact, viz., bombing, which required mitigation, and which mitigation they approved independently of the Planning Board. Their solution to the safety question for the adjacent day care facility was a concrete reinforced embankment. However, there are other matters for the lead agency’s consideration like pedestrian and road traffic, persons in the facility, possible disruption to adjoining businesses, and the need for the presence of law enforcement officials.
Generic approval is initially allowed on condition that when the more specific use is known or determined, the lead agency then applies the appropriate process to determine and evaluate any adverse environmental impact. ([SEQRA] 6 NYCRR 617.3 [g] [1]; 617.10, 617.10 [d] [2], [4]; [e].) When the abortion use was disclosed, it was incumbent upon the owner to submit the matter back to the Planning Board as lead agency (not to the Planner) to determine the relevant areas of environmental concern, take a hard look and make a reasoned elaboration of the basis for its determination. Upon such resubmission, if the Planning Board found as the Planner did that bombing was a possible adverse effect of the property being used for an abortion clinic, then the Planning Board would be required to give adequate public notice, and take a hard look at that as well as any other determined impacts raised by the public and affected parties associated with the use in determining the appropriateness of siting the abortion clinic in this neighborhood.
The determination of the suitability of the barrier was made solely by the Planner and approved by the Zoning Board, while SEQRA law reserves those determinations solely to the lead agency, which is the Planning Board.
Since the underlying determinations necessary to the appropriate land use and/or environmental siting decision of this facility were never made, the determination of the Planning Board is annulled and the process is to proceed de novo. (Matter of Taxpayers Opposed to FloodMart v City of Hornell Indus. Dev. Agency, 212 AD2d 958, 959 [4th Dept 1995]; Matter of TriCounty Taxpayers Assn. v Town Bd. of Town of Queensbury, 55 NY2d 41 [1982]; see also Matter of Padavan [Cuomo], supra at 14, col 1.)
[Portions of opinion omitted for purposes of publication.]