OPINION OF THE COURT
Martin Schoenfeld, J.
In this CPLR article 78 proceeding petitioners seek, essentially, (1) a declaration that the promulgation of a "Protocol” by respondent the City of New York (the City) regulating the removal of lead paint from City-owned elevated transportation structures (bridges) is subject to the procedural requirements of (1) the State Environmental Quality Review Act (ECL art 8 [SEQRA]); (2) the New York City Environmental Quality Review (Executive Order No. 91 of 1977, 43 RCNY, ch 6, § 6-01 et seq. [now 62 RCNY, ch 5, Appendix A] [CEQR]); and (3) the New York City Administrative Procedure Act (NY City Charter, ch 45, § 1041 et seq. [CAPA]); and (2) permanently to enjoin the City from implementing the Protocol or conducting any lead paint removal from City-owned bridges without complying with the foregoing statutes, rules and regulations. Petitioners have moved for the relief requested in the petition and respondents have cross-moved to dismiss or for summary judgment. The parties have agreed that the submissions before this court, may, in all respects, without the need for serving a formal answer, be treated as a motion and cross motion for summary judgment. For the reasons set forth herein, the court finds that the Protocol and the significant removal of lead paint *983 from City-owned bridges are subject to SEQRA and CEQR but not, as matters now stand, to CAPA.

The Parties

The instant petitioners comprise an eclectic group of neighborhood civic organizations; City and State elected officials; a Community Board; a health advocacy group; and citizen-taxpayers. Besides the City, respondents consist of the Mayor of the City and four City agencies: the Department of Transportation (DOT); the Department of Environmental Protection (DEP); the Department of Health (DOH); and the Bureau of Bridges (part of DOT).

Lead Paint on City Bridges

There are some 2,062 bridges within the confines of the City, of which the City itself owns or co-owns some 838, "excluding culverts”. (Respondents’ reply affidavit of John P. McTigue ¶ 3.) To retard corrosion, many of them have previously been covered with paint containing lead in a "concentration * * * many orders of magnitude” higher than that in the paint formerly used in residential housing. (Petition 31.)
City-owned bridges are normally repainted every 10 years, currently with non-lead-based paint. However, during repainting, repair, rehabilitation, or maintenance work it is often necessary to dislodge paint so that rust may be removed or to allow the welding of new metal against old metal. In fact, "[l]ead paint removal is an integral part of virtually every maintenance project that the Bureau [of Bridges] conducts on City-owned bridges.” (Respondents’ answering affidavit [hereinafter referred to as Answering Affidavits] of Frederick Pascopella 1124.)
There are various techniques to remove paint from metal bridges. The technique that is the fastest, does the best job of the removal itself, and is best able to reach into hard-to-access areas is called "abrasive blasting” (or "sandblasting”), in which particles of sand are propelled by highly compressed air against the surface to be cleaned. Unfortunately, this process spews a cloud of paint particles into the surrounding atmosphere; in the case of lead paint, the cloud contains paint chips and a "fine lead dust” (petition ¶ 34). As expressed by respondents: "abrasive blasting, more than any other method of paint removal, poses potential health hazards through the creation of fine lead dust * * * [I]n certain areas on bridges other methods are ineffective, and therefore NYCDOT needs to retain the op *984 tion to use abrasive blasting as a last resort.” (Answering Affidavit of Virginia Maher 20.) Furthermore, "abrasive blasting is the only process that is able to remove ’bonded’ rust, which is rust that has become incorporated onto the surface of steel.” (Answering Affidavit of Frederick L. Pascopella ¶ 16.)

Health Effects of Lead Ingestion

According to petitioners, and not disputed by respondents: "Lead is a highly toxic metal which, when absorbed into the human body, produces a range of adverse health effects, particularly in children and fetuses. These effects include nervous and reproductive system disorders, delays in neurological and physical development, cognitive and behavioral changes, and hypertension, most of which are irreversible.” (Petition ]f 26.) Petitioners’ medical expert, John F. Rosen, M.D., opines, in his moving affidavit ( 9) that ”[n]o blood lead threshold is too low to be disassociated with the adverse effects on IQ and cognitive and central nervous system functioning” in children. The Federal Centers for Disease Control and Prevention have lowered from 25 to 10 the number of micrograms of lead per deciliter of blood that they consider to be a health concern/ issue. (Petition ¶ 27.) Lead can enter the body through inhalation or through swallowing and absorption through the gastrointestinal tract. Children appear to be particularly vulnerable to lead because their hand-to-mouth activity increases ingestion and because their central nervous systems are still developing.

Williamsburg Bridge Paint Removal, 1992

In or about June of 1992 the Bureau of Bridges, using an outside contractor, began maintenance work on the Brooklyn side of the Williamsburg Bridge. As alluded to in the petition, paragraphs 30 (Brooklyn) and 64-65 (Manhattan), and as many New Yorkers know, the Williamsburg Bridge stretches over densely populated neighborhoods, teeming with children, on both sides of the East River. By all accounts, the project was a public relations and public health fiasco (to use petitioners’ term, "disaster”). Petitioners have submitted videotape taken in late June and early July of 1992 in Williamsburg showing a dust cloud emanating from the work area on the bridge and what are arguably sloppy waste collection procedures. Respondents note that ”[o]n numerous occasions during the sandblasting * * * the City halted work when the contractor failed to stop dust releases” and that ”[t]he levels of lead in [sampled] dust revealed that the release had affected an area within a 500 foot radius on the Brooklyn side of the bridge.” (Petition *985 exhibit 7 [page 2 of letter from City, Oct. 27,1993]; see, Answering Affidavit of Enid Carruth ¶ 7.) The Brooklyn work was halted after neighboring residents complained about environmental degradation. Work then began on the Manhattan side, resulting in a similar community response and a "final” cessation. On July 8, 1992 the New York State Department of Environmental Conservation issued "a notice of violation to the contractor for fugitive dust emissions of greater than 20%.” (Respondents’ mem of law, at 3-4.) Subsequent testing of children living in the immediate vicinity of both sides of the bridge revealed that several were suffering from lead poisoning (which, the court notes, may or may not have resulted from the sandblasting).

The Task Force

On September 2, 1992, in response to a request by Brooklyn Borough President Howard Golden, the office of then-Mayor David Dinkins announced the formation of the Williamsburg Bridge Abrasive Blasting Task Force under First Deputy Mayor Norman Steisel to "monitor, investigate and make appropriate remedial recommendations regarding the containment breach that occurred on the Williamsburg Bridge during the summer of 1992 and to develop the Protocol for containment and monitoring of lead removal operations during future bridge repairs.” (Answering Affidavit of Virginia Maher ¶ 4.) The Task Force included representatives from DOT, DEP, DOH, the New York State Departments of Health and Environmental Conservation, Community Boards 1 in Brooklyn and 2 in Manhattan, and Williamsburg Around the Bridge Block Association. Dr. Philip Landrigan of the Mount Sinai Medical-Center Division of Environmental and Occupational Medicine served as "an independent expert on the health risks associated with environmental exposure to lead.” (Id., ¶ 7.) Petitioners claim that "City representatives dominate[d]' [the Task Force’s] procedures and conduct.” (Petitioners’ moving affidavit of John F. Rosen, M.D. 29.)
In a letter dated September 21, 1993, to DEP and DOT, several of the organization petitioners "demandfed] that the City comply with the mandatory public review processes outlined in SEQRA, CEQR, and CAPA, including the preparation of an EIS [i.e., Environmental Impact Statement].” (Petition, exhibit 6 [letter, at 7].) In a responsive letter dated October 27, 1993, the City denied that the Task Force’s promulgation of a lead paint removal Protocol was subject to "SEQRA and CAPA.” (Petition, exhibit 7 [letter, at 3].)

*986
The Protocol

The "PROTOCOL, NYC DOT Bureau of Bridges” (Petition, exhibit 3; Answering Affidavit of V. Maher, exhibit 6) was issued in final form dated December 20, 1993. (Petitioners contend that the Task Force "minutes do not even indicate which person or persons determined the final Protocol was adequate and approved its promulgation.” [Petitioners’ reply affidavit of J. Rosen 2.]) It is divided into the following sections: General Policy Statement For Lead Paint Removal; Compliance Procedures; Containment Procedures; Air /Surface Soil Monitoring Procedures; Clean Up Procedures; Community Notification Procedures; and Worker Protection Procedures. The General Policy Statement indicates that "[t]he policies and procedures outlined below will be applied to all of the lead paint removal activities * * * conducted by the Bureau of Bridges.” If there is "a failure of the containment systems and/or dust collection equipment utilized at a given site, the lead paint removal operation at that location will be halted immediately” until modifications are made to bring the activity into compliance with the Protocol. (Id., at 2.) The rest of the 24-page Protocol delineates in (to a layperson, somewhat numbing) detail the paint removal methods and, essentially, the compliance, containment, clean-up, monitoring, and community notification procedures attendant thereto. The Protocol will, it appears, apply to scores of bridge maintenance and repair projects every few years. Frederick L. Pascopella, the Chief Engineer/Director in the Bureau of Bridges, in his Answering Affidavit ( 7) has summarized the significance of the -Protocol as follows: "The Protocol is a set of guidelines and procedures which NYCDOT will follow during lead paint removal conducted as part of the NYCDOT’s routine maintenance of City-owned bridges * * * There are approximately 417 City-owned bridges with lead paint on them and on average, lead paint is removed from some portion of 52 of these bridges per year.”
Petitioners contend that the Protocol is inadequate in numerous scientific/technical regards. However, this court has neither the authority nor the expertise to judge the Protocol on its merits. It is clear from respondents’ submissions (including many lengthy Task Force internal memoranda) and from the document itself that much time, effort, and thought was expended in its promulgation. There appears to have been a very good-faith effort to draft a set of procedures that will minimize the escape of lead dust into the atmosphere.
*987 Petitioners also contend that the Protocol is arbitrary and capricious, and constitutes an abuse of discretion. However, it clearly passes muster under the applicable standard of review. "Where the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom, the courts regularly defer to the governmental agency charged with the responsibility for administration of the statute. If its interpretation is not irrational or unreasonable, it will be upheld.” (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980] [citation omitted].)

SEQRA and CEQR

Deciding whether the Protocol is subject to mandatory environmental review is a far different question, essentially consisting of a determination of legislative intent. "Where, however, the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations are therefore to be accorded much less weight.” (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d, supra, at 459.) Furthermore, the statutes, regulations, and cases make clear that the scope of environmental review is to be determined by the potential environmental impact. "SEQRA insures that agency decision-makers — enlightened by public comment where appropriate — will identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices.” (Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 414-415 [1986].)
ECL 8-0109 provides as follows:
"1. Agencies shall use all practicable means to realize the policies and goals set forth in this article, and shall act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects, including effects revealed in the environmental impact statement process.
"2. All agencies * * * shall prepare * * * an environmental impact statement on any action they propose or approve which *988 may have a significant effect on the environment. Such a statement shall include a detailed statement setting forth the following:
"a) a description of the proposed action and its environmental setting;
"b) the environmental impact of the proposed action * * * "c) any adverse environmental effects which cannot be avoided should the proposal be implemented;
"d) alternatives to the proposed action * * *
"f) mitigation measures proposed to minimize the environmental impact * * *
"4. As early as possible in the formulation of a proposal for an action, the responsible agency shall make an initial determination whether an environmental impact statement need be prepared for the action.”
In particular, 6 NYCRR 617.11 sets forth that "a substantial adverse change in existing air quality” (6 NYCRR 617.11 [a] [1]) and "the creation of a hazard to human health” (6 NYCRR 617.11 [a] [7]) are illustrative of "significant effects on the environment”. Clearly, the removal of lead paint from City-owned bridges that would be governed by the Protocol is encompassed by the foregoing. Furthermore, ECL 8-0105 (4) (ii) defines "actions” to include "policy, regulations and procedure-making.” Consistent with this, 6 NYCRR 617.2 (b) (2) and (3) defines actions to include "agency planning and policy making activities that may effect the environment and commit the agency to a definite course of future decisions” and "adoption of agency rules, regulations and procedures * * * that may affect the environment.”
CEQR, originally codified at 43 RCNY chapter 6 (now 62 RCNY, ch 5, Appendix A), provides as follows:
"§ 6-12 Agency Decision Making, (a) No final decision to carry out or approve an action which may have a significant effect on the environment shall be made until after the filing and consideration of a final EIS.
"(b) When an agency decides to carry out or approve an action which may have a significant effect on the environment, it shall make the following findings in a written decision:
"(1) consistent with social, economic and other essential considerations of state and city policy, from among the reasonable alternatives thereto, the action to be carried out or approved is one which minimizes or avoids adverse environmental effects to the maximum extent possible * * *
*989 "(2) consistent with social, economic and other essential considerations of state and city policy, all practicable means will be taken in carrying out or approving the action to minimize or avoid adverse environmental effects.”
Section 6-06 (a) provides that "[a]n action may have a significant effect on the environment if it can reasonably be expected to lead to * * * (1) a substantial adverse change to ambient air * * * quality * * * or in solid waste production * * * [or] * * * (7) the creation of a hazard to human health or safety.”
While the City standard of "can reasonably be expected” appears to be higher than the State standard of "may” have a significant effect, clearly overhead abrasive blasting of lead paint, ipso facto, creates a "hazard” to human health. In the leading case of Chinese Staff & Workers Assn. v City of New York (68 NY2d 359, 364-365 [1986]), the Court of Appeals stated that under SEQRA and CEQR, "[t]he threshold at which the requirement that an EIS be prepared is triggered is relatively low: it need only be demonstrated that the action may have a significant effect on the environment.” Furthermore, like its State counterpart, CEQR 6-02 (4), defines action to include "policy making activities such as the making, modification or establishment of rules, regulations, procedures, policies and guidelines.”
What strikes one immediately about the Protocol vis-á-vis SEQRA and CEQR is that the Protocol is something of an ersatz EIS itself. Certainly there is some overlap between what an EIS must contain and what the Protocol does contain, and some similarity between the process by which the Protocol was drafted and the procedures mandated by SEQRA and CEQR. Furthermore, the summer of 1992 fiasco showed that removal of paint from the Williamsburg Bridge "may have a significant effect on the environment.” Moreover, both SEQRA and CEQR require consideration of short- and long-term environmental impacts. (ECL 8-0109 [2] [b]; CEQR 6-06 [b].)
However, respondents have never contended that the Protocol is an EIS, or that they have complied with SEQRA or CEQR. (See, Horn v International Bus. Machs., 110 AD2d 87, 92 [2d Dept 1985] ["literal compliance with SEQRA’s procedural requirements for integrating environmental considerations into the decision-making process is mandated”].) Rather, since the Protocol clearly fits squarely within the ambit of SEQRA and CEQR, respondents have essentially argued that promulgation of the Protocol was "exempt”.
Pursuant to 6 NYCRR 617.3 (j) SEQRA’s review procedures do not apply to "exempt” actions. In 6 NYCRR 617.2 (q) (3), an *990 "action” is declared exempt if it consists of "maintenance or repair involving no substantial changes in an existing structure”. Similarly, 43 RCNY 6-04 (f) provides an exemption for "maintenance or repair involving no substantial changes in existing structures”.
In this court’s view, several factors militate against finding the work governed by the Protocol to be "maintenance or repair.” First, in Padavan v Cuomo (NYLJ, June 27, 1984, at 14, cols 1, 2 [Sup Ct, Queens County] [construction and installation of security facilities at hospital]), the court stated that the " 'maintenance and repair’ ” exemption "must be read to apply to routine and ordinary maintenance and repairs on existing facilities.” In this court’s view, maintenance that emits a cloud of poisonous dust over a populated area is anything but "routine and ordinary.” Interestingly, 6 NYCRR 618.2 (a) (17) indicates that "the application of salts and other chemicals for snow removal and ice removal” may require SEQRA review, since it is not merely the minor alteration of a road, trail or path.
Furthermore, as noted by petitioners (reply mem of law, at 9), respondents concede that the Protocol will apply to "major rehabilitation projects.” (Answering Affidavit of Frederick L. Pascopella ¶¶ 21-22; accord, respondents’ reply mem of law, at 6, n 2.) "Rehabilitation” certainly goes beyond "maintenance or repair”, and, a fortiori, "major rehabilitation” certainly goes beyond "routine maintenance or repair.” Also, form should not be elevated over substance. The drafters of the phrase "maintenance or repair” presumably were distinguishing such work from activity that generates a toxic by-product.
In attempting to distinguish Matter of Northeast Solite v Flacke (91 AD2d 57 [3d Dept 1983] [facility generating "industrial wastes and heavy metals” excluded from SEQRA requirements by "grandfather clause”]), respondents note that "NYCDOT is not in the business of producing hazardous materials”. (Reply mem of law, at 6.) Northeast Solite was not in the business of producing hazardous wastes either; the hazardous wastes at issue were a by-product of producing "aggregate building material.” (Matter of Northeast Solite v Flacke, at 57-58, supra.) More importantly, there is nothing in the statutes or regulations at issue, or in common sense, to suggest application of an "in the business of’ test. Abrasive blasting of immense overhead structures covered with lead paint creates toxic dust with the potential to rain down on food markets, homes, schools, parks, and playgrounds, regardless of whether *991 creation of the dust is the objective or merely an unfortunate by-product of the blasting.
Thus the court finds that the promulgation of the Protocol and any work to be conducted thereunder are both subject to and not exempt from SEQRA and CEQR. Petitioners have also set forth a considerable argument that the promulgation of the Protocol is also subject to SEQRA and CEQR since permits will be needed for the removal of the lead-contaminated waste generated by the bridge work. (See, 6 NYCRR 617.2 [b] [1] [iii].)

City Administrative Procedure Act

The City Administrative Procedure Act, codified in New York City Charter, chapter 45, § 1041 et seq., "added at General Election, November 8, 1988”, requires certain procedures for "rules” to be "adopted.” (NY City Charter § 1043 [a].) Once again, respondents do not contend that they followed the prescribed procedures. Rather, they contend that the Protocol does not constitute a "rule.” A "rule” is defined in section 1041 (5) to "mea[n] * * * any statement * * * of general applicability that (i) implements or applies law or policy.” Furthermore, pursuant to section 1041 (5) (a), "rule” includes "any statement or communication which prescribes (i) standards which, if violated, may result in a sanction or penalty * * * [and] (v) standards for the procurement of goods and services.” Pursuant to section 1041 (5) (b), "rule” does "not include any (i) statement or communication which relates only to the internal management * * * of an agency which does not materially affect the rights of or procedures available to the public.”
As petitioners note in their moving memorandum of law in proposing to amend the City Charter to define "rule” the Charter Revision Commission referred to the "thousands of city rules that regulate private behavior.” (Mem of law, at 37-38.) In this court’s view, CAPA’s procedural protections are bestowed upon those members of the public who will be directly affected by an adopted rule. (See, Matter of Schwartfigure v Hartnett, 83 NY2d 296, 302 [1994] [recoupment policy constituted a rule since it "directly and significantly affect(ed) that segment of the public over which (the Agency) exercis(ed) direct authority”]; cf., Matter of Jones v Smith, 64 NY2d 1003, 1005 [1985] [rules pertaining to disciplinary hearings for prisoners governed "that segment of the 'general public’ over which the Department of Correctional Services exercises direct authority”].) In the instant case, as respondents contend, "the Protocol does not govern the conduct of any segment of the general pub- *992 lie or regulate private behavior” (answering mem of law, at 26); rather, it sets forth rules that the City adopted for its own behavior. The behavior itself is subject to all manner of environmental protection laws (and, of course, to public leverage through the political process); and the rules (we hold today) are subject to SEQRA and CEQR procedural requirements; but the rules’ adoption is not within the purview of CAPA.
Petitionérs’ argument that the Protocol is "of general applicability” to potential paint removal contractors is unavailing for two reasons. First, petitioners’ capsule autobiographies indicate that none of them would have standing to assert such a claim. Secondly, and in any event, the Protocol does not seek to "prescribe * * * standards for the procurement * * * of services”. It simply mandates what the services will be, not the procedure by which they will be procured.
In Matter of Cordero v Corbisiero (80 NY2d 771 [1992]), relied upon by petitioners, the rule at issue governed horse jockeys who raced at Saratoga, committed an infraction, and unsuccessfully appealed. Thus the rule governed that segment of the public over which the New York State Racing and Wagering Board exercised direct authority. While jockeys should be afforded input into racetrack disciplinary rules, it would be a horse of a different color to allow input to the many thousands of viewers and bettors who may be indirectly affected by the degree of "fair play” at the races.

Relief

Petitioners are entitled to injunctive relief requiring respondents to comply with SEQRA and CEQR. (CPLR 7801, 7806; see, New York City Coalition to End Lead Poisoning v Koch, 138 Misc 2d 188 [Sup Ct, NY County 1987] [New York City Housing Maintenance Code and Health Code imposed mandatory duties on municipal defendants to remove lead paint hazards in New York City housing], affd 139 AD2d 404 [1st Dept 1988], on remand NYLJ, July 21, 1989, at 18, col 3 [Sup Ct, NY County], affd 170 AD2d 419 [1st Dept 1991], on remand NYLJ, May 12, 1993, at 29, col 3 [Sup Ct, NY County].)
Respondents may, of course, take "emergency actions which are immediately necessary on a limited and temporary basis for the protection or preservation of life, health, property or natural resources”, but only to the limited extent set forth in 6 NYCRR 617.2 (q) (4) (accord, CEQR 6-04 [h]). Any follow-up to emergency action is "fully subject” to SEQRA. (6 NYCRR 617.2 [q] [4].)

*993
Conclusion

Thus for the reasons set forth herein, this court finds and declares that the "PROTOCOL, NYC DOT Bureau of Bridges” issued in final form dated December 20, 1993, is subject to the procedural requirements of the State Environmental Quality Review Act (ECL art 8, § 8-0101 et seq., the New York City Environmental Quality Review (Executive Order No. 91 of 1977, 43 RCNY, ch 6, § 6-01 et seq. [now 62 RCNY, ch 5, Appendix A]), and that the "PROTOCOL” is not subject to the New York City Administrative Procedure Act (NY City Charter, ch 45, § 1041 et seq.).
The petition is granted to the extent set forth above, respondents’ cross motion to dismiss or for summary judgment is denied and respondents are hereby enjoined from implementing the Protocol and from conducting any lead paint removal from City-owned elevated transportation structures, or expending any funds therefor, without complying with the applicable requirements of SEQRA and CEQR.