**HERALD SQUARE LOFT CORP., Plaintiff,**

v.

**MERRIMACK MUTUAL FIRE INSURANCE CO., Defendant.**

**No. 03 Civ. 7682(DC).**

United States District Court, S.D. New York.

Nov. 15, 2004.

Ball & Rubin, LLP, by Wayne M. Rubin, Esq., Elmsford, NY, for Plaintiff.

Faust, Goetz, Schenker & Blee, by Erika C. Aljens, Esq., New York, NY, for Defendant.

### MEMORANDUM DECISION

CHIN, District Judge.

In this diversity case, plaintiff Herald Square Loft Corp. ("Herald Square") seeks a declaratory judgment that the pollution exclusion provision of an insurance policy issued to it by defendant Merrimack Mutual Fire Insurance Company ("Merrimack") is not applicable to the loss caused by lead paint dust contamination of one of Herald Square's buildings resulting from repair work performed by a contractor.

The parties stipulated to a summary trial on agreed facts and documentary evidence, and waived their right to call live witnesses. Upon consideration of the stipulated facts and the arguments of the parties, the Court will enter judgment in favor of Herald Square on its claim that the pollution exclusion clause of the policy does not exclude coverage for the loss or

damage caused by the lead paint dust contamination of Herald Square's building in or about March 2003. My findings of fact and conclusions of law follow.

## STATEMENT OF THE CASE

### A. The Facts

The parties submitted a statement of agreed facts, which I adopt in full and incorporate herein. (*See* Stipulation to Summ. Bench Trial ("Stip.") at 1). The facts may be summarized as follows:

#### 1. The Insurance Agreement

Herald Square owns and operates a ten-story building with two exterior walls located in midtown Manhattan (the "Building"). (Stip. ¶ 3). For the period April 5, 2002, to April 5, 2003, the Building was covered under an insurance policy (the "2002 policy") issued by Merrimack that included, among other things, commercial property coverage. (Stip. ¶ 12). The 2002 policy covered loss or damage to the Building except for loss or damage specified in several exclusions listed in a special form endorsement. (*Id.* Ex. C at 69–75). The language at issue here excludes from coverage damage or loss arising out of the:

[d]ischarge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss."

(*Id.* at 71). The 2002 policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis,

chemicals and waste. Waste includes materials to be recycled, re-conditioned ro[or] reclaimed." (*Id.* at 58).

The specified causes of loss for which pollution coverage is provided include: "[f]ire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; [and] water damage." (*Id.* at 75).

#### 2. The Exterior Walls Inspection

In or about November 1999, Herald Square retained Rand Engineering, P.C. ("Rand") to inspect the exterior walls of the Building for the purpose of complying with New York City law. (*Id.* ¶ 4). Herald Square asked Rand to hire contractors to repair certain parts of the Building, including removing the paint from the exterior wood window frames and sashes throughout the front of the Building and the fire escapes in the back of the Building. (*Id.* ¶ 5). After a bidding process, Herald Square entered into a contract with Jade Scaffolding Corp. ("Jade") to remove the paint. (*Id.* ¶ 6). Jade began work on the repairs in or about September 2002. (*Id.* ¶ 7).

#### 3. Lead Paint is Discovered

In or about March 2003, Herald Square stopped Jade from working because of concerns that the work was producing lead contamination in the Building. (*Id.*). Herald Square learned that some of the children who lived in the building had elevated levels of lead in their blood.[1] (*Id.* ¶ 8). Herald Square retained Independent Monitoring and Analysis ("IMA") to determine whether there was lead contamina-

---

1. Neither party has conceded that the elevated levels of lead were due to the work performed by Jade. (Stip. ¶ 8).

tion in the building and, if so, its source. (*Id.* ¶ 9). IMA concluded that there was lead poisoning in the Building, and that its source was leaded dust created when Jade used a high-speed grinder to remove lead based paint from the window frames on the front of the building and fire escapes on the rear of the Building. (*Id.* ¶ 10). The lead paint dust came into the Building through windows and was tracked into the Building from the sidewalk in front of the main entrance. (*Id.*).

### 4. *Herald Square Seeks Reimbursement*

Herald Square alleges it has incurred more than $100,000 in expenses to clean-up the lead paint dust contamination, replace window air-conditioner units and other equipment contaminated with the lead dust, and relocate some of the residents pending removal of the lead contamination. (*Id.* ¶ 11). In or about March 2003, Herald Square submitted a claim to Merrimack for reimbursement of the damages and losses caused by the lead paint dust contamination. (*Id.* ¶ 13). On May 16, 2003, Merrimack timely denied coverage on the ground that the damage sustained by Herald Square fell within the pollution exclusion clause of the 2002 policy. (*Id.* ¶ 14).

On or about February 3, 2003, Merrimack sent Herald Square a notice of conditional renewal. (*See* Stip. Ex. E): This notice described a change in the policy for coverage from April 5, 2003, until April 5, 2004. (*Id.*). In this notice, Merrimack informed Herald Square of a "reduction of coverage: a lead paint exclusion form is added." (*Id.;* Stip. ¶ 15). The parties agree that lead paint dust is a solid contaminant that may be hazardous to health. (*Id.* ¶ 16).

### DISCUSSION

■■■ The principal issues in this case are whether the pollution exclusion clause of the insurance policy is ambiguous and whether the clause excludes coverage for losses caused by lead paint dust resulting from repairs. After setting out the applicable New York insurance law, I will address the merits.[2]

### A. *Applicable Law*

■■■ Insurance policies are read "in light of 'common speech' and the reasonable expectations of a businessperson." *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383, 763 N.Y.S.2d 790, 795 N.E.2d 15 (2003) (quoting *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 457 N.E.2d 761 (1983)). "[I]t is appropriate to construe the standard pollution exclusion clause in light of its general purpose, which is to exclude coverage for environ-

---

**2.** The parties have stipulated that New York law applies to the interpretation of the Merrimack policy. (Stip. ¶ 17). Federal courts sitting in diversity must apply the choice of law rules of the forum state to determine the law applicable to the substantive issues. *Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir.2001). Accordingly, New York's choice of law rules apply. The 2002 policy is silent as to choice of law. In the absence of a choice of law provision, New York courts apply the law of the forum in which the "center of gravity" or "grouping of contacts" is located. *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir.1997); *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1030–31 (2d Cir.1996). Herald Square is incorporated in New York. (*See* Stip. ¶ 1). The insured building that was damaged by leaded dust is located in New York. Also, while Merrimack is located in Massachusetts, it has agents in New York and the adjuster who denied Herald Square's claim is also located in New York. (*See* Stip. Exs. C, D). Because of these facts and the parties' stipulation, this Court applies New York law. *See Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir.1984).

mental pollution." *Stoney Run Co. v. Prudential–LMI Comm. Ins. Co.,* 47 F.3d 34, 37 (2d Cir.1995). An insurer faces a "heavy burden" when negating coverage based on an exclusion. *Belt Painting Corp.,* 100 N.Y.2d at 384, 763 N.Y.S.2d 790, 795 N.E.2d 15 (quoting *Westview Assoc. v. Guaranty Nat'l Ins. Co.,* 95 N.Y.2d 334, 340, 717 N.Y.S.2d 75, 740 N.E.2d 220 (2000)). If an insurer "negate[s] coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Id.* at 383, 763 N.Y.S.2d 790, 795 N.E.2d 15 (quoting *Continental Cas. Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 652, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993)). Insurance policy exclusions are given a "strict and narrow construction," and if the exclusion provision is found to be ambiguous, any ambiguity will be resolved against the insurer. *Id.*

### B. *Application*

The 2002 policy excludes indemnification for damage from the "[d]ischarge, dispersal, seepage, migration, release or escape of 'pollutants.'" (Stip. Ex. C at 71). "Pollutants" are defined as "any solid ... irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (*Id.* at 58). The indemnification sought by Herald Square is for damages arising out of what the parties describe as "leaded dust" from high-speed grinding on the outside of Herald Square's building. (Stip. ¶ 10).

The threshold question is whether this language unambiguously excludes coverage for damages caused by leaded dust to the Building. Merrimack argues that the language does unambiguously exclude such a loss, and its position is not without some support. Lead contaminants are a "pollutant" and the lead contaminants here were released or dispersed into the Building.

Nonetheless, I conclude that the language is ambiguous and that the exclusion does not apply here for the following reasons: first, the language of the exclusion section is overly broad and does not exclude coverage with the required specificity; second, common sense and the reasonable expectations of the parties support the conclusion that the exclusion does not apply; third, the New York cases have overwhelmingly held that pollution exclusion clauses do not exclude contaminants such as lead paint; and fourth, Merrimack sent Herald Square a notice of reduction in coverage by adding a lead paint exclusion to the 2003 policy.

### 1. *The Language is Overly Broad*

■ The language of the pollution exclusion clause of the 2002 policy is so broad that it cannot literally mean what it says. As defined, "pollutants" is so broad that ambiguity is created. Literally construed, the words would encompass the "release" or "dispersal" of ordinary household dust, for household dust is arguably a "solid ... irritant or contaminant, including ... waste." In describing the seemingly limitless reach of the broad language of a similar pollution exclusion policy, the Seventh Circuit cited hypothetical examples involving Drano and chlorine: "reading the clause broadly would bar coverage" for one who slips and falls on a bottle of spilled Drano or who sustains injury from chlorine in a pool. *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037, 1043 (7th Cir.1992). And as the Fourth Department has held, the "term 'pollutant' is ambiguous because there is virtually no substance or chemical in existence that is not an 'irritant or contaminant.'" *Roofers' Joint Training, Apprentice & Educ. Comm. of Western N.Y. v. Gen. Accident Ins. Co. of America,* 275 A.D.2d 90, 92–93, 713 N.Y.S.2d 615 (4th

Dep't 2000) (also citing Drano and chlorine examples).

The terms used in the exclusion clause to describe damage from "discharge, dispersal, seepage, migration, release or escape" are "terms of art in environmental law, generally used to describe the improper disposal or containment of hazardous waste." *Sphere Drake Ins. Co. v. Y.L. Realty Co.*, 990 F.Supp. 240, 243 (S.D.N.Y. 1997). Ambiguity thus exists because the words could be read in two ways: first, narrowly in a manner consistent with the traditional understanding that these clauses excluded coverage for environmental pollution, or second, broadly to give the words their literal but expansive meaning.

This ambiguity must be resolved in favor of Herald Square, as the insured, for extending the clause to cover the facts of this case "would require an overly broad interpretation" of the exclusion. *Id.; see Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 476 N.E.2d 272 (1984) ("[Exclusions] are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction"). Inasmuch as the pollution exclusion clause is overly broad, I conclude that the language is ambiguous and that this ambiguity must be construed against Merrimack. *See Stoney Run Co.*, 47 F.3d at 37.

### 2. *Reasonable Expectations of a Policyholder*

■ The parties could not have reasonably expected the pollution exclusion—intended to exclude coverage for environmental pollution—to bar coverage for damages resulting from repairs to the Building. *See Stoney Run Co.*, 47 F.3d at 39 ("[A] reasonable policyholder might not characterize [the act] as environmental pollution."). It is important to consider that "the proper starting point for an analysis of the operative effect of any pollution exclusion clause is the recognition that a pollution exclusion, like any other exclusion, operates to exclude coverage for acts [that] are otherwise insured." Barry R. Ostrager & Thomas R. Newman, *Handbook on Ins. Coverage Disputes* § 10.02 (10th ed.2000). Given Herald Square's reasonable expectation of coverage, Merrimack faces a heavy burden for this exclusion to apply. *See Stoney Run Co.*, 47 F.3d at 37; *Belt Painting Corp.*, 100 N.Y.2d at 383, 763 N.Y.S.2d 790, 795 N.E.2d 15. For Merrimack to meet its burden, the exclusion must have been "stated in clear and unmistakable language, [and have been] subject to no other reasonable interpretation." *Id.* at 383, 763 N.Y.S.2d 790, 795 N.E.2d 15 (quoting *Continental Cas. Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 652, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993)). Merrimack has not met its burden.

The question is not whether leaded dust is a "pollutant" for purposes of a pollution exclusion clause; it is whether a "reasonable policyholder" would consider leaded dust removed from exterior windows and fire escapes during routine repairs to be environmental pollution. *See Stoney Run Co.*, 47 F.3d at 39; *Sphere Drake Ins. Co.*, 990 F.Supp. at 244; *Roofers' Joint Training, Apprentice & Educ. Comm. of Western N.Y.*, 275 A.D.2d at 92, 713 N.Y.S.2d 615 (holding that an "ordinary insured in plaintiff's shoes would not understand" exclusion).

Here, Jade was using a high speed grinder to make general repairs to the Building. Leaded dust blew into the Building through windows and was tracked into the Building from people walking into the main entrance with leaded dust on their shoes. This is not the type of "environmental pollution" for which the 2002 policy excludes coverage. The 2002 policy does not specify the coverage or lack

thereof among the varying degrees and open interpretations of "pollution." *See Belt Painting Corp.,* 100 N.Y.2d at 384, 763 N.Y.S.2d 790, 795 N.E.2d 15 (explaining that pollution exclusions were originally included in policies by insurance companies to protect against "long-term, gradual discharge of hazardous waste and byproducts"); *see also Williamsburg Around the Bridge Block Assoc. v. Giuliani,* 167 Misc.2d 980, 637 N.Y.S.2d 241, 243 (N.Y. 1995) (describing a large "dust cloud emanating from the work area") *aff'd,* 223 A.D.2d 64, 644 N.Y.S.2d 252 (1st Dep't 1996). According to Merrimack's interpretation of the exclusion clause, the same language excludes coverage for damages from large scale toxic environmental pollution as from repairs done to window sills. This could not have been the expectation of the parties when the 2002 policy was issued. Plainly read, this language "extend[s] far beyond its intended scope." *Roofers' Joint Training, Apprentice & Educ. Comm. of Western N.Y.,* 275 A.D.2d at 93, 713 N.Y.S.2d 615 (quoting *Pipefitters Welfare Educ. Fund,* 976 F.2d at 1043). This extension is inconsistent with "accepted usage and the expectations of the contracting parties." *Sphere Drake Ins. Co.,* 990 F.Supp. at 243; *see also Belt Painting Corp.,* 100 N.Y.2d at 383, 763 N.Y.S.2d 790, 795 N.E.2d 15.

Reading the 2002 policy "in light of 'common speech' and the reasonable expectations of a businessperson," it is clear that Herald Square could not have contemplated damage to the Building from its leaded paint dust from repairs to be "environmental pollution." *Belt Painting Corp. v. TIG Ins. Co.,* 100 N.Y.2d 377, 383, 763 N.Y.S.2d 790, 795 N.E.2d 15 (2003) (quoting *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.,* 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 457 N.E.2d 761 (1983)).

### 3. *New York Case Law*

Pollution exclusion clauses have a long history in New York insurance policies. *See Belt Painting Corp.,* 100 N.Y.2d at 384–86, 763 N.Y.S.2d 790, 795 N.E.2d 15 (describing history of pollution exclusions in New York). During the 1970s, pollution exclusion clauses were required in all commercial and industrial liability policies in New York. *See id.* at 385, 763 N.Y.S.2d 790, 795 N.E.2d 15. From the beginning, these clauses were included in policies to hold corporate polluters responsible for their actions. *Id.; see also Stoney Run Co.,* 47 F.3d at 37; *Sphere Drake Ins. Co.,* 990 F.Supp. at 244. Over time, legislation and judicial legislation has caused the insurance industry to change the wording and extent of coverage of exclusion policies, but the general purpose of the clause, "to shield insurers from the costs of environmental cleanups," remains. *Belt Painting Corp.,* 100 N.Y.2d at 386, 763 N.Y.S.2d 790, 795 N.E.2d 15.

The language in the 2002 policy is industry standard, at least when compared to language found in policies at issue in other reported cases, and it suffers from the same shortcoming as other policies examined by courts in New York: "[a]t best, the language remains ambiguous, and this ambiguity is fatal to [the insurer's] position." *Sphere Drake Ins. Co.,* 990 F.Supp. at 244; *see also Stoney Run Co.,* 47 F.3d at 39 ("[T]he pollution exclusion clause can be reasonably interpreted as applying only to environmental pollution.... Accordingly ... the pollution exclusion clause [is] ambiguous."); *Belt Painting Corp.,* 100 N.Y.2d at 387, 763 N.Y.S.2d 790, 795 N.E.2d 15 ("Reasonable minds can disagree as to whether the exclusion applies here."); *Roofers' Joint Training, Apprentice & Educ. Comm. of Western N.Y.,* 275 A.D.2d at 92, 713 N.Y.S.2d 615 (holding pollution exclusion policy ambiguous be-

cause insured would not understand lack of coverage).

The New York cases have consistently applied a strict interpretation to pollution exclusion clauses. *See, e.g., Belt Painting Corp.,* 100 N.Y.2d at 388, 763 N.Y.S.2d 790, 795 N.E.2d 15 (court reluctant to adopt an interpretation that would infinitely enlarge the scope of the term "pollutants"); *Sphere Drake Ins. Co.,* 990 F.Supp. at 243 (extension would require "overly broad interpretation"); *Roofers' Joint Training, Apprentice & Educ. Comm. of Western N.Y.,* 275 A.D.2d at 93, 713 N.Y.S.2d 615 (exclusion clause requires a "limiting principle") (quoting *Pipefitters Welfare Educ. Fund,* 976 F.2d at 1043).

■■■ Finally, and perhaps most significantly, the insurance industry has left the relevant language in pollution exclusion clauses unchanged notwithstanding the numerous cases that question or reject its applicability to lead paint. These cases have repeatedly held that this language simply "fail[s] to exclude lead with adequate specificity." *Sphere Drake Ins. Co.,* 990 F.Supp. at 244; *see also Belt Painting Corp.,* 100 N.Y.2d at 384–86, 763 N.Y.S.2d 790, 795 N.E.2d 15; *Westview Assoc. v. Guaranty Nat'l Ins. Co.,* 95 N.Y.2d at 340, 717 N.Y.S.2d 75, 740 N.E.2d 220 ("There is no language that demonstrates the drafter's intent to incorporate lead paint into the pollution exclusion clauses."). This leaves but one conclusion: pollution exclusion clauses are inapplicable to losses resulting from lead paint unless such losses are specifically excluded. *See Sphere Drake Ins. Co.,* 990 F.Supp. at 243 (citing cases); *Belt Painting Corp.,* 100 N.Y.2d at 388, 763 N.Y.S.2d 790, 795 N.E.2d 15; *Westview Assoc. v. Guaranty Nat'l Ins. Co.,* 95 N.Y.2d at 340, 717 N.Y.S.2d 75, 740 N.E.2d 220.

Merrimack relies heavily on a 1995 New York decision in an Article 78 proceeding, where the court found lead paint removal subject to environmental protection laws. (Resp. Br. at 2–4) (citing *Williamsburg Around the Bridge Block Assoc. v. Giuliani,* 167 Misc.2d 980, 637 N.Y.S.2d 241 (N.Y.1995), *aff'd,* 223 A.D.2d 64, 644 N.Y.S.2d 252 (1st Dep't 1996)). To be sure, there are similarities between the facts in *Williamsburg* and the facts here: in both cases high speed grinders were used to remove lead based paint and the result posed potential health hazards. The differences, however, are more significant.

For example, the *Williamsburg* case was an Article 78 proceeding seeking a declaration that New York City was required to comply with various procedural safeguards and environmental codes before removing lead based paint from bridges. Insurance coverage was not in issue. *See Williamsburg,* 637 N.Y.S.2d at 242. This case requires an interpretation of an insurance policy. Another significant difference is the volume and effect of the leaded dust. In *Williamsburg,* there was a "dust cloud emanating from the work area" on the bridge, while in the present case, leaded dust was created from paint being removed from the windows and fire escapes of the Building, infiltrating the Building. *See id.,* 637 N.Y.S.2d at 243; (Stip. ¶ 10). Although the facts of *Williamsburg* are similar, the case does not control the outcome of this case.

### 4. The Notice of Reduction of Coverage

Because the pollution exclusion clause is ambiguous, it will be construed against Merrimack. *See Belt Painting Corp. v. TIG Insurance Co.,* 100 N.Y.2d at 383, 763 N.Y.S.2d 790, 795 N.E.2d 15. This alone warrants a finding that the exclusion does not apply to these facts. There is, however, another consideration.

■■■ On or about February 3, 2003, a short time before Herald Square submit-

ted its claim to Merrimack for reimbursement, Merrimack sent Herald Square a notice of conditional renewal. (*See* Stip. Ex. E). This notice described a change in the policy for coverage from April 5, 2003, until April 5, 2004. (*Id.*). In this notice, Merrimack informed Herald Square of a "reduction of coverage: a lead paint exclusion form is added." (*Id.*). Either Merrimack recognized the ambiguity in the pollution exclusion as it was written in the 2002 policy or Merrimack did not consider lead paint to be excluded by the 2002 policy's pollution exclusion. As the notice is of a "reduction in coverage," it appears that Merrimack considered damages from lead paint to be covered in the 2002 policy. Either way, it is not tenable for Merrimack to now assert that "[t]he clear and unequivocal language of the policy in effect at the time of the incident clearly excludes coverage for the clean up of the lead paint dust that infiltrated the Building" when it had sent notice to Herald Square of a reduction in coverage by excluding damage liability from lead paint. (Def. Mem. at 5). Merrimack's communication to Herald Square that it was reducing its coverage by adding a lead paint exclusion to the 2003 policy unequivocally shows that neither party considered damage from lead paint to be excluded from coverage under the 2002 policy's pollution exclusion language.

## CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Herald Square on its claim for a judgment declaring that the pollution exclusion clause of the 2002 policy is not applicable to the loss or damage caused by the lead paint dust contamination of the Building in or about March 2003. Herald Square shall submit a proposed judgment on notice within five days hereof.

SO ORDERED.